IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SEMA'J GRIFFIN | : | |
| Plaintiff, | : | CASE NO. 2:21-cv-3922 |
| v. | : | MAGISTRATE JUDGE JOLSON |
| LLOYD AUSTIN, Secretary of Defense | : | |
| Defendant. | : | |

**PLAINTIFF SEMA'J GRIFFIN'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.  Statement of Pertinent Facts**

    **A.  Griffin begins his employment with Defendant in May 2019.**

Griffin began his employment with Defense Logistics Agency as a Student Intern on May 19, 2019. (R.27 Koukourakis TR 11, PageID # 1073)  Student Interns are brought to work at the Defendant's Defense Logistics Agency ("DLA") facility in Columbus while they are pursuing their college degrees with the hope that they can be trained into permanent positions when they achieve their degrees. (R.27 Koukourakis TR 8, PageID # 1070)  This is called progressing into the Pathways to Career Excellence ("PACE") program, and the employees in that program are called PACERS. (R.27 Koukourakis TR 7-8, PageID # 1069-70)  It is presumed that the Interns know little if anything about the job when they begin. (R.29 Swiggum TR 8, PageID # 1190) Griffin was in a classroom lecture for the first weeks of his employment. (R.26 Griffin TR 32, PageId # 149)  He was deployed "to the floor" to start performing actual work tasks on August 19, 2019, in the Quality Management ("QM") area under the daily supervision of Supervisory Customer Relations Specialist Michael Swiggum ("Swiggum"). (R.29 Swiggum TR 7, Page ID # 1189; R.26 Griffin TR 49-50, 53, PageID # 166-67, 170)  Swiggum reported directly to Branch

Chief Sally Souvannavong ("Souvannavong"). (R.27 Koukourakis TR 10-11, PageID # 1072-73) When Swiggum was off work for any reason, Griffin would report to Derrick Dobbins ("Dobbins") who held the same position as Swiggum for another team. (R.26-4 Dobbins Aff. Ex. 1-3, p. 546-47, PageID # 912-13)

### B. Defendant lacks any training program or structure for Griffin to be judged on.

There was no training program set up in QM for Griffin. (R.27 Koukourakis TR 36, PageID # 1098; R.29 Swiggum TR 20, PageID # 1202; R.26 Griffin TR 135-36, PageID # 152-53) This was an oversight that was to have been corrected previously, but no action was ever taken. (R.27 Koukourakis TR 36-37, PageID # 1098-99) Instead, Griffin was given the menial task of reviewing "NIN" spreadsheets and changing one designation where necessary from "CJ" to "CY" and noting the reason for any change. (R.29 Swiggum TR 21, PageID # 1203; R.26 Griffin TR 54, 67, PageID # 171, 184) Swiggum gave Griffin very minimal training in this task, and it became almost the sole work Griffin performed every day for eight (8) months. (R.26 Griffin TR 54, PageID # 171) Griffin repeatedly asked to be taught other tasks or areas and was given virtually no such training or opportunities. (R.26 Griffin TR 138, 142, PageID # 255, 259)

### C. Griffin's ADHD affects his workplace behavior and becomes an immediate target for Souvannavong's wrath.

In Griffin's first couple of weeks on the floor, Swiggum noticed that Griffin would get up out of his seat often, and that his attention appeared to wander during times he trained him. (R.29 Swiggum TR 10-12, PageID # 1192-93) Swiggum went to Career Program Specialist for the Student Intern Program Craig White ("White") to discuss these behaviors. (R.29 Swiggum TR 10-12, PageID # 1192-93; R.27 Koukourakis TR 9, PageID # 1071) It was also known that White was engaged to Griffin's mother, and that White and Griffin lived in the same house,

giving White potentially greater insight into Griffin's behaviors. (see R.29 Swiggum TR 30, PageID # 1212; R.26 Griffin TR 117, PageID # 234)  White reported to Swiggum that Griffin suffered from Attention Deficit Hyperactivity Disorder ("ADHD") and Tourette's Syndrome. (R.29 Swiggum TR 10-12, PageID # 1192-93)  Immediately after meeting with White (i.e. the same day), Swiggum reported Griffin's ADHD and Tourette's to Souvannavong, who without missing a beat said, "I don't want that in my department." (R.29 Swiggum TR 12-13, PageID # 1194-95)  Souvannavong's claim that she made that statement regarding overall performance is not credible, given Griffin had only been on the floor a few weeks. (see R.28 Souvannavong TR 9-10, PageID # 1142-43)  Souvannavong then outlined to Swiggum a demand to subject Griffin to intensive scrutiny as to his use of time and the accuracy of the performance of his duties with the purpose of getting him out of the department. (R.29 Swiggum TR 13-14, PageID # 1195-96) Souvannavong had Griffin's workstation moved to right outside of her door so that she could personally monitor him. (R.27 Koukourakis TR 23-24, PageID # 1085-86)  While Swiggum was on paternity leave, Souvannavong demanded that Griffin email her when he came in and when he left, as well as periodically throughout the day email her as to what work he was performing. (R.29 Swiggum TR 15, PageID # 1197). This emailing request was so far outside the norm that when HR found out about it Souvannavong was ordered to immediately cease the requirements. (R.29 Swiggum TR 15, PageID # 1197)  Souvannavong then wanted Swiggum to engage in the same program of emails she had been stopped from performing. (R.29 Swiggum TR 15-16, PageID # 1197-98)

### D. Griffin is directed to access Defendant's reasonable accommodation process but is stymied by its procedures and the COVID pandemic.

For his part, Swiggum also informed Griffin of DLA's reasonable accommodations office and procedures and ordered paperwork to be given to Griffin to apply for protection regarding his sometimes paripatetic nature. (R.29 Swiggum TR 13, PageID # 1195) Griffin had been diagnosed with his conditions at the age of four (4) and had found ways to cope with them without medications since the middle of high school. (R.26 Griffin TR 111-16, PageID # 228-233) Griffin submitted a letter from his family doctor but was told that was not enough. (R.26 Griffin TR 119-22, PageID # 236-40) Griffin then found a psychiatrist who stated he would need multiple appointments to properly assess Griffin's conditions so as to recommend accommodations. (see R.26 Griffin TR 198, PageID # 323) Griffin began attending appointments in October of 2019 and kept management aware of his progress. (R.29 Swiggum TR 39, PageID # 1221; R.27 Koukourakis TR 16, PageID # 1078) He was unable to complete all necessary appointments until the beginning of the COVID shutdowns in March 2020, and his psychiatrist did not complete and submit his report to DLA until after Griffin was already removed. (R.26 Griffin TR 124-26, PageID # 241-43)

### E. Griffin reasonably reports being targeted by Souvannavong early on in his employment.

White was exempted from any decision-making supervisory activity regarding Griffin because of their familial connection. (R.29 Swiggum TR 30, PageID # 1212) This meant that White's direct supervisor for his Student Intern Program (not his floor supervisor, who was Swiggum) was Career Program Specialist for the PACE Program George Koukourakis ("Koukourakis"). (R.27 Koukourakis TR 7, Page ID # 1069) On September 10, 2019, Griffin met with Koukourakis to report that he felt he was being targeted for removal by Souvannavong

4

and maybe Swiggum. (see R.26-2 Ex. 1, p. 408, PageID # 774) Koukourakis transmitted Griffin's feelings in a lengthy email to Souvannavong and Swiggum that same day. (R.26-2 Ex 1, p. 408, PageID # 774) He instructed the two supervisors that Griffin, as a Student Intern, was expected to initially lack job-related knowledge. (R.26-2 Ex 1, p. 408, PageID # 774) He urged the two to provide mentorship for Griffin and a greater variety of experiences to both enrich Griffin's experience as well as challenge Griffin to learn. (R.26-2 Ex 1, p. 408, PageID # 774) Swiggum felt Griffin was justified in his feelings of being targeted. (R.29 Swiggum TR 49, PageID # 1231). After Swiggum returned from paternity leave, Souvannavong told Swiggum that Griffin had accused Swiggum of race and disability discrimination, though Swiggum found Griffin had never made such an accusation against him, i.e. Souvannavong had lied to Swiggum. (R.29 Swiggum TR 58-60, PageID # 1240-42) In the end, Swiggum acknowledged that no real action was taken in response to Koukourakis' email. (R.29 Swiggum TR 52, PageID # 1234) Swiggum also clearly stated that he did not have the time to properly act as Griffin's mentor, as requested by Koukourakis. (R.29 Swiggum TR 52, PageID # 1234). In one cryptic statement in Koukourakis' email, Koukourakis stated, "If this approach isn't acceptable to you both, then I'll pursue the other course we discussed yesterday and remove Sema'J from your team." (R.26-2 Ex 1, p. 408, PageID # 774). This was at a time that Swiggum stated he had advocated for Griffin to stay with the team, so this must have meant that Souvannavong wanted that outcome. (see R.29 Swiggum TR 19-20, 36, PageID # 1201-02, 1218).

### F. Griffin had issues with time reporting and policies but adjusted reasonably quickly to resolve those issues.

Griffin had exhibited problems with DLA's work time reporting system. One of the main problems was understanding "core hours," which for Griffin were 7:30 a.m.-3:30 p.m. daily.

5

(R.26 Griffin TR 155-56, PageID # 272-73) While Griffin understood that he was to come in a time of his choosing but not before 6:00 a.m. and to work eight (8) hours per day (with a half-hour lunch), he thought he could leave earlier than 3:30 p.m. if he came in early enough to get his eight (8) hours in. (R.25 Griffin TR 29-31, PageID # 146-48) This problem was detected, brought to Griffin's attention, and corrected. (R.26 Griffin TR 155-56, PageID # 272-73) Griffin also thought at one time he could work off the clock outside of normal work hours to catch up backlogged duties. (R.26 Griffin TR 156-57, 159, PageID # 273-74, 276) Again, this was detected, brought to Griffin's attention, and corrected. Finally, the nature of the Intern's advance time reporting was changed from a one-week to a two-week advance interval. (R.26 Griffin TR 163-64, PageID # 283-84) Griffin had a little trouble adjusting to this initially, but quickly fell in step. (R.26 Griffin TR 163-64, PageID # 283-84) At no time was Griffin ever accused of "stealing time." (R.27 Koukourakis TR 22, PageID # 1084) In fact, in the one instance he was accused of wrongly working for free, i.e. giving away his time. (see R.26 Griffin TR 156-57, 159, PageID # 273-74, 276)

### G. Souvannavong exhibited ferocity and persistence in pursuing Griffin's removal from her Branch.

Griffin continued to be hectored to distraction by Souvannavong and other Customer Account Specialist ("CAS") employees enlisted by Souvannavong to watch his movements. (R.29 Swiggum TR 16, PageID # 1198; Griffin TR 75, 147, 153, PageID # 292, 264, 270) Griffin could not leave his desk to get water or go to the restroom without being asked by someone where he had gone and how long it had taken. (R.26 Griffin TR 75, 147, 153, PageID # 292, 264, 270) To extend his time away from his desk, Griffin was told by Souvannavong that he could not use a close by restroom, as that was a "privilege" he had not "earned." (R.26 Griffin

6

TR 85-86, PageID # 202-03) The situation was so oppressive that Griffin came to describe it as a "prison watch." (R.26 Griffin TR 78, PageID # 295)

Souvannavong continued to advocate Griffin's removal from the QM area to Swiggum and Dobbins starting at the 4-6 week point and continuing through the end of Griffin's employment. (R.28 Souvannavong TR 33-34, PageID # 1166-67) Swiggum and Dobbins regularly defended Griffin demanding he be given a fair chance to succeed. (R.29 Swiggum TR 18-20, 36-37, 54, PageID # 1200-02, 1218-20, 1234) At one point, Souvannavong asked for a statement from Swiggum to reassign Griffin and called him into a meeting and argued with him when he refused to write it, stating that from that moment forward she would provide no help to him regarding Griffin. (R.29 Swiggum 56-57, PageID # 1238-39) Dobbins noted the unduly harsh and personal nature of Souvannavong's attacks on Griffin's work status as time went by. (R.26-3 Dobbins Aff. Q.28, Ex. 1, p. 551, PageID # 917) Swiggum went to DiPaolo more than once to try and get him to intervene with Souvannavong on the issue but received no guidance at all. (R.29 Swiggum TR 16-17, PageID # 1198-99) Swiggum and Dobbins went to White to see if anything could be done, expressing that Souvannavong was "a discouraging factor" in Griffin completing his work. (R.29 Swiggum TR 62-64, PageID # 1246-48) Koukourakis attested to the difficulty that a normal employee would have dealing with such harassment and intense scrutiny. (R.27 Koukourakis TR 41, PageID # 1102) Dobbins described Griffin being subjected to a ridiculous environment of monitoring of his every move and no training. (R.26-3 Dobbins Aff. Q.29, Ex. 1, p. 551, PageID # 917) Dobbins stated unequivocally that Souvannavong was responsible for Griffin's removal through false claims to upper management, and that Swiggum was only able to buy Griffin a couple of additional weeks at the end. (R.26-3 Dobbins Aff. Q.30, Ex. 1, p. 551, PageID # 917) No one would get between Souvannavong and her target.

**H. Griffin's last Quarterly Report before discharge shows is positive and shows improvement in all areas.**

Griffin was given his last Quarterly Report by Swiggum on July 15, 2020. (R.26-1 Ex. 1, p. 193-999, PageID # 559-65)  Griffin had been given three (3) prior such reports and had received "Needs Improvement" on the first two, and "Satisfactory" on the one prior to the last Report. (R.26-1 Ex. 1, p. 171-92, PageID # 537-558)  Griffin felt he received the one "Satisfactory" because during the bulk of that quarter he had been away from Souvannavong. (R.26 Griffin TR 179, PageID # 296)  In the July 15, 2020, Quarterly Report Swiggum rated Griffin as acceptable in all general areas on the report that required a numeric response or a "YES-NO" ratings. (R.26-1 Ex. 1, p. 195-96, PageID # 561-62)  Swiggum's comments were generally complementary as to Griffin's improvement in prior problem areas and his ability to complete his work with accuracy. (R.26-1 Ex. 1, p. 196-97, PageID # 562-63)  All witnesses who were asked to assess the review felt that it was a generally positive review. (R.27 Koukourakis TR 33-35, 39-40, Page Id # 1097; R. 29 Swiggum 27-29, PageID # 1209-11; R.28 Souvannavong TR 22-23, PageID # 1145-46)

**I. Souvannavong's supervisor, at Souvannavong's behest, sends an email that is in stark contrast to Griffin's last QR and asks for Griffin's removal from the area.**

On August 23, 2020, five (5) weeks after the July 15, 2020, Quarterly Report, Lt. Commander Ryan DiPaolo ("DiPaolo") sent an email to Koukourakis in which he requested that Griffin be removed from his Directorate. (R.31-1 Ex. 6, p. 3, PageID # 1326)  DiPaolo cited any and all negative areas set forth in prior Quarterly Reports without providing said reports and also without stating any of the positive areas and areas of improvement. (see R.31-1 Ex. 6, p. 3, PageID # 1326)  Koukourakis was "taken aback" by the difference in content and tone between Griffin's final Quarterly Report and DiPaolo's email, believing it described a "whole different

8

situation." (R.27 Koukourakis TR 40, PageID # 1102). Koukourakis concluded from DiPaolo's email that, "they just didn't want him on the team anymore. Performance or non-performance, it didn't matter." (R.27 Koukourakis TR 40, PageID # 1102) The events that led to this email are fuzzy, but it is clear that Souvannavong: (1) asked Swiggum to provide a short statement to DiPaolo supporting Griffin's *reassignment* and that, (2) Souvannavong had one-on-one conversations with DiPaolo regarding Griffin being removed from her area without Swiggum present. (R.28 Souvannavong TR 25-27, PageID # 1158-60; R.29 Swiggum TR 24, PageID # 1206) Swiggum provided a generally negative statement, as requested, but evidently felt that Griffin would be reassigned and not discharged. (R. 29 Swiggum TR 24-25, PageID # 1206-07) DiPaolo even suggested that reassignment might be an option for Griffin. (see R.31-1 Ex. 6, p. 3, PageID # 1326; R.27 Koukourakis TR 41, PageID # 1102). Swiggum even expressed the likelihood of reassignment to Griffin a few days before the discharge. (R.29 Swiggum TR 23, PageID # 1205) Swiggum noted Griffin's excitement at the prospect of reassignment, and that he exhibited a "complete reversal' and had "more drive and effort" after the conversation. (R.29 Swiggum TR 35, 61, PageID # 1217, 1243)

> **J. The information sent to the final decision maker appeared deliberately skewed and incomplete in a way that assured a negative outcome.**

Per normal procedure upon a request for removal from someone at Dipaolo's level, Koukourakis put together a group of documents that was to have included (1) a Staff Summary Sheet drafted by HR asking that the Chief of Staff (Col. Samuel Payne ["Payne"]) take action, but not setting forth any particular action recommendation; (2) DiPaolo's request for removal from QM; (3) Griffin work status documents and job description: (4) a recommendation of action by HR; (5) all or Griffin's Quarterly Reports; and, (6) any disciplinary documents or other

9

documents he felt should carry weight in the situation. (R.27 Koukourakis TR 25-26, PageID # 1087-88; see R.31-1 Ex. 6, *supra.*, PageID # 1324-86)  Payne was to then review this packet and make a decision as to reassignment or removal. (R.27 Koukourakis TR 25-26, PageID # 1087-88)

Payne's description of his review was that it was cursory at best.  Payne failed to notice that not all of Griffin's Quarterly Reports were in the packet. (R.31 Payne TR 18-19, PageID # 1309-10) The notable exception was the one Quarterly Report on which Griffin had been termed "Satisfactory," and Payne stated that might have affected his decision. (R.31 Payne TR 18-19, PageID # 1309-10)  Payne reported essentially looking at only the final assessments on the Quarterly Reports and not the details and comments that would have painted a fuller picture. (R.31 Payne TR 16, PageID # 1307)  He acknowledged in testimony that, upon review, Swiggum's comments on the final QR were generally positive and should have carried some weight and acknowledged that "Needs Improvement" in and of itself was not a disqualifying rating. (R.31 Payne Tr 16, 18, Page ID # 1307, 1309)  The HR recommendation was literally one non-descriptive sentence, which Payne never asked to be illuminated by the reasoning behind it. (R.31-1 Ex. 6, p. 19, PageID # 1342; R.31 Payne TR 14, PageID # 1305)  For instance, Payne never talked to Koukourakis. (R.27 Koukourakis TR 29, Page ID # 1091)  Payne was not made aware of Griffin's ongoing access to the reasonable accommodations process, and admitted it was a "pretty large variable" and that he doesn't know how it might have affected his decision had he known. (R.31 Payne TR 21, PageID # 1312)  In the end, Payne stated that "no decision ever comes with 100% of the information," and that he trusted his subordinates to provide all of the "pertinent information." (R.31 Payne TR 20, 23-24, PageID # 1311, 1314-15)  Though

10

DiPaolo had recommended reassignment, Payne decided to remove Griffin totally from service. (R.31 Payne TR 11, PageID # 1302)

## II. Argument

### A. Griffin's claim must survive under the proper standard of review for determining summary judgment.

Summary judgment is guided by the standard set forth in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, (1986), and *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). When determining summary judgment, this Court must consider all evidence in the light most favorable to Griffin, as the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 533 U.S. 133, 150 (2000). However, in addition, the United States Supreme Court has noted that when determining whether to grant summary judgment, a reviewing court must "disregard all evidence favorable to the moving party that the [fact finder] is not required to believe." *Reeves*, 533 U.S. at 151. Finally, the Court is also prohibited from making its own credibility determinations regarding such evidence. *Id.*

### B. A reasonable jury could decide that Griffin meets the elements for disability discrimination under the Rehabilitation Act.

The elements of a prima facie claim for disability discrimination under the Rehabilitation Act are (1) proof that the person is a disabled person under the law; (2) that he was a qualified to perform the position with or without a reasonable accommodation; and, (3) proof of an adverse employment action based solely on his disabled status. *Bent-Crumbley v. Brennan*, 799 F.App'x 342, 345b (6th Cir. 2020). As explained below, a reasonable jury could decide that Griffin can meet those elements.

11

### 1. Griffin was "disabled" under the statute.

Defendant has admitted for purposes of summary judgment that Griffin had a disability. Griffin asserts that his ability to retain information, and to concentrate on learning any given task was affected by his ADHD, which could qualify him as being actually disabled. Griffin also asserts that Souvannavong's actions, coupled with Swiggum and Koukourakis' referral to Defendant's reasonable accommodation process means that Defendant at the very least perceived Griffin had a disability. Souvannavong's negative actions because of that perception qualify Griffin as "disabled," as his condition was neither transitory nor minor. see 42 U.S.C. § 12102(3).

### 2. Griffin was qualified to perform the position with or without a reasonable accommodation.

The determination of whether an individual is qualified is determined by (1) whether the individual meets the necessary prerequisites for the job, such as education, training, experience, etc., and (2) whether the individual can perform the essential job functions with or without reasonable accommodation. see 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m), see *McRory v.* Griffin met the necessary prerequisites for his position or he never would have been hired. As explained in his positive Quarterly Report on July 15, 2020, Griffin could perform the essential job functions of his position. (R.26-1 Ex. 1, p. 171-92, PageID # 537-558) In that Quarterly Report Swiggum rated Griffin as acceptable in all general areas on the report that required a numeric response or a "YES-NO" ratings. (R.26-1 Ex. 1, p. 195-96, PageID # 561-62) Swiggum's comments were generally complementary as to Griffin's improvement in prior problem areas and his ability to complete his work with accuracy. (R.26-1 Ex. 1, p. 196-97, PageID # 562-63) All witnesses who were asked to assess the review felt that it was a generally

12

positive review. (R.27 Koukourakis TR 33-35, 39-40, Page Id # 1097; R. 29 Swiggum 27-29, PageID # 1209-11; R.28 Souvannavong TR 22-23, PageID # 1145-46)

Griffin was not perfect, and no one is suggesting he was. Swiggum stated there was still room for improvement as "[h]e was still an intern." (R.29 Swiggum TR 28, PageID # 1210) Griffin's learning was a little slower and he needed more repetition than the average employee, but he was proficient not just in the basic "CJ/CY" duties he was given for eight (8) months, but also in other duties given him. (see R.29 Swiggum TR 22, PageID # 1204) Though Griffin was seeking a reasonable accommodation of a few more breaks, he was able to perform the duties well enough to be considered a "qualified individual" under the statute. (see R.26 Griffin TR 126-27, PageID # 243-44)

### 3. Griffin was discharged solely because of his disability

From the moment she found out Griffin had ADHD, Souvannavong targeted him for removal by stating, "I do not want that in my department." (R.29 Swiggum TR 12-13, PageID # 1194-95) Souvannavong then took actions designed to effect Griffin's removal constantly throughout his short employment by,

> (1) exercising harassing and undue scrutiny herself and using others to assist her in that activity; (R.29 Swiggum TR 16, PageID # 1198; Griffin TR 75, 78, 85-86, 147, 153, PageID # 192, 195, 202-03, 264, 270 78, PageID # 295)
>
> (2) hovering over Griffin by placing him right outside her door; (R.27 Koukourakis TR 23-24, PageID # 1085-86)
>
> (3) harassing Griffin's immediate supervisors to write him up and ask for his removal to the point where it seemed to become a personal vendetta; (R.29 Swiggum TR 13-14, 18-20, 36-37, 54, 56-57, PageID # 1195-96, 1200-02, ,1218-20, 1234, 1238-39;

13

R.26-3 Dobbins Aff. Q.28, Ex. 1-3, p.551, PageID # 917; R.28 Souvannavong TR 33-34, PageID # 1166-67)

(4) directly harassing Griffin with requirements so onerous that she was ordered to stop by HR, then trying to have Swiggum take up the same policies; (R.29 Swiggum TR 15-16, PageID # 1197-98) and,

(5) finally acting directly upon Swiggum, then Ryan DiPaolo to write statements that was seemingly the opposite of Griffin's Quarterly Report given a mere five (5) weeks before and that made it seem as if Griffin's performance didn't matter. (R.27 Koukourakis TR 40, PageID # 1102; R.28 Souvannavong TR 25-27, PageID # 1158-60; R.29 Swiggum TR 24, PageID # 1206)

Her actions were so discouraging to Griffin that he perked up noticeably the moment Swiggum told him he would likely be reassigned. (R.29 Swiggum RR 23, 35, 61, PageID # 1205, 1217, 1243)  Defendant has acknowledged that the amount of harassment dished out by Souvannavong would naturally make it harder for Griffin to work. (R.29 Swiggum TR 62-64, PageID # 1246-48; R.26-3 Dobbins Aff. Q.29, Ex 1-3, p. 5551, PageID # 917; R.27 Koukourakis TR 41, PageID # 1102)  All of this constitutes direct evidence of unlawful discrimination by the person to whom Griffin's supervisor directly reported, and who Griffin was forced to sit right outside her office.

While Souvannavong was not the final decision maker in this scenario, she pulled the strings and manipulated the players and eventually accomplished the deed.  This case exemplifies the cat's paw theory of discrimination. *Staub v. Proctor Hosp.*, 562 U.S. 411, *supra,* (2011)  Souvannavong damaged Griffin's ability to work and put constant pressure on Swiggum and Dobbins to write up Griffin for removal, and when they sought help from others in management to stop this activity that help was not forthcoming. (see R.29 Swiggum TR 16-17,

14

62-64, PageID # 1198-99, 1246-48) Souvannavong directly influenced DiPaolo to write an email she knew Koukourakis would be forced to act upon, even though the content of the email was in direct contrast to the very recent Quarterly Report issued on Griffin. (R.28 Souvannavong TR 25-27, PageID # 1158-60; R.29 Swiggum TR 24, PageID # 1206) Having set all of this in motion, Souvannavong would reasonably have felt safe in the likelihood that Griffin would be removed from her Branch. Lt. Cmdr. DiPaolo, then Col. Payne, were Souvannavong's "cat's paws." That Griffin was discharged rather than being reassigned may not have been an inevitability, but it was a definite and likely possibility. Had Griffin not been identified to Souvannavong as suffering from ADHD, she would not have targeted him for removal, i.e., the process to remove him would never have started. Had Souvannavong not targeted Griffin in the manner described above, he would not have been discharged.

### 4. The alleged legitimate non-discriminatory reasons set forth by Defendant are pretextual, leaving Griffin's disability as the sole reason for discharge.

Griffin can prove to a reasonable jury that he was discharged solely because of his disability by proving that the reasons set forth by Defendant were pretextual under the *Manzer* test. He can prove pretext by proving "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.'" *Manzer v, Diamond Shamrock Chem., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993) (emphasis added and quotation marks omitted). Griffin "must only prove enough to create a genuine issue as to whether the rationale is pretextual." *Mitchell v. U.S. Postal Service*, 738 F.App'x 838, 847 (6th Cir. 2018).

15

Absent Souvannavong's vendetta against Griffin which was fueled by her knowledge of his disability, Griffin would never have been treated in the highly scrutinized manner described above. While it may be true that Souvannavong used the reasons stated by Defendant to pillory Griffin every chance she got, the only reason she acted in that manner was her aversion to his disability. Since the root cause of the problems was discriminatory, everything that falls thereafter must also be considered a product of that discrimination unless Griffin committed some egregious willful act that would reasonably be a superseding cause for discharge. Griffin was trying his hardest and not committing any willful violations right through to the end of his employment. With Souvannavong's discrimination as the root cause and driving force of the highly scrutinized atmosphere that inflated Defendant's reasons into something allegedly dischargeable, a reasonable jury could reach the conclusion that the sole reason Griffin was discharged was due to his disability.

### a. Griffin's ability to perform his job tasks was adequate for a Student Intern.

In the July 15, 2020, Quarterly Report, Swiggum rated Griffin as acceptable in all general areas on the report that required numeric or "YES-NO" ratings. (R.26-1 Ex. 1, p. 195-96, PageID # 561-62) Swiggum's comments were generally complementary as to Griffin's improvement in prior problem areas and his ability to complete his work with accuracy. (R.26-1 Ex. 1, p. 196-97, PageID # 562-63) All witnesses who were asked to assess the review felt that it was a generally positive review. (R.27 Koukourakis TR 33-35, 39-40, Page Id # 1097; R. 29 Swiggum 27-29, PageID # 1209-11; R.28 Souvannavong TR 22-23, PageID # 1145-46). Swiggum explained his "needs improvement" rating in his deposition as follows:

```
12  Q. Towards the bottom of this page, you say
13     there is a still room for improvement in all areas
```

16

```
14  with more focus needed on processing BZ/Norm actions.
15  Correct?

16  A. Yes.

17  Q. Did you consider that to be acceptable to
18   you for a college intern, still room for improvement?

19  A. To be acceptable?

20  Q. Yes.

21  A. I mean, yeah. He's still in the training
22  position.
```

(R.29 Swiggum TR 28, Page ID # 1210) Col. Payne also explained that a "needs improvement" rating on a Quarterly Review was not automatically disqualifying to a candidate. (R.31 Payne TR 18-19, PageID # 1309-10) Swiggum acknowledged Griffin's success performing a greater variety of tasks, as well. (R.29 Swiggum TR 22, PageID # 1204) Simply put, Griffin could and did do the job of a Student Intern.

### b. The time recording issue was de minimus and quickly corrected in every case, and Griffin never "stole time."

The "core hours" problem was detected, brought to Griffin's attention, and corrected. (R.26 Griffin TR 155-56, PageID # 272-73) Griffin also thought at one time he could work off the clock outside of normal work hours to catch up backlogged duties. (R.26 Griffin TR 156-57, 159, PageID # 273-74, 276) Again, this was detected, brought to Griffin's attention, and corrected. Finally, the nature of the Intern's advance time reporting was changed from a one-week to a two-week advance interval. (R.26 Griffin TR 163-64, PageID # 283-84) Griffin had a little trouble adjusting to this initially, but quickly fell in step. (R.26 Griffin TR 163-64, PageID # 283-84) At no time was Griffin ever accused of "stealing time." (R.27 Koukourakis TR 22, PageID # 1084) In fact, in the instance of working off the clock, he was accused of wrongly

working for free, i.e. *giving away* his time. (see R.26 Griffin TR 156-57, 159, PageID # 273-74, 276). These issues were de minimus, at worst, and Griffin was not accused of any wrongdoing for personal gain.

        **c. It is unfair and unlawful to determine that Griffin did not seek a reasonable accommodation as the only thing that delayed his request was Defendant's procedural rules and the COVID pandemic.**

Griffin sought reasonable accommodation regarding his "time out of the chair" issue. He started the process with a form and a letter from his treating physician but was told that he had not provided enough medical information. (R.26 Griffin TR 122-23, PageID # 239-40). Griffin could not accomplish the necessary doctor's appointments within the 45-day window provided for by Defendant, and therefore had to start the process again. (R.26 Griffin TR 123, PageID # 240) He was about to wrap up all the appointments his doctor felt necessary to issue a report when COVID hit and his doctor's office shut down. (R.26 Griffin TR 124, PageID # 241). The doctor finally issued a report but it came to Defendant after Griffin had already been discharged. (R.26 Griffin TR 125, PageID # 242)

The prior story is meant to demonstrate that (1) Griffin did diligently seek a reasonable accommodation; and, (2) he was frustrated in that attempt by Defendant's rules and the COVID pandemic. It is arguable that Defendant should have acted upon Griffin's initial request, as "[t]o properly request a reasonable accommodation, [Griffin] need not use any 'magic words,' like accommodation, disability, or ADA; however, [he] must tie the request, in context, to [his] existing medical restrictions." *Longstreet v. Ind. Comm. of Ohio,* Case No. 1:14 CV 2619, *5 (N.D.Ohio May 12, 2015), citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004), see also *Roebuck v. Summit Cty. Dept. of Job and Family Servs*, Case No. 5:13 CV 2816, *5 (N.D.Ohio May 30, 2014), citing *Smith v. Henderson*; see also *Mestas v. Town of Evansville*,

Case No. 17-8092, *7-8 (10th Cir. Sept. 6, 2019), citing *EEOC v. C.R. England Co.,* 644 F.3d 1028, 1049 (10th Cir. 2011). Griffin had his doctor verify his ADHD condition and was simply trying to pursue the ability to take more frequent breaks to deal with his antsiness and satisfy those who did not understand why he got up and stretched his legs more often than others. (R.26 Griffin TR 126-27, PageID # 243-44). Defendant made him jump through major hoops to accomplish a small accommodation.

## IV. Conclusion

Griffin's disability was the sole reason why he found himself subjected to removal by Defendant. A reasonable jury could find the alleged legitimate non-discriminatory reasons set forth by Defendant to be pretextual, leaving nothing but Griffin's disability as the reason for discharge. Defendant's Motion for Summary Judgment must be DENIED.

Respectfully Submitted,

s/ Gary A. Reeve
Gary A. Reeve (0064872)
Trial Attorney for Plaintiff
Law Offices of Gary A. Reeve
5354 Cemetery Road
Hilliard, Ohio 43026
(614) 808-1881

## CERTIFICATE OF SERVICE

This is to certify that a true copy of Plaintiff's Response in Opposition was served upon Defendant's counsel electronically through the ECF system this 17th day of November, 2022.

s/ Gary A. Reeve
Gary A. Reeve