## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **SEMA'J GRIFFIN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO. 2:21-cv-3922** |
| | : | |
| | : | **MAGISTRATE JUDGE JOLSON** |
| **LLOYD AUSTIN, SECRETARY OF DEFENSE,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff SeMa'j Griffin ("Plaintiff" or "Griffin") wants this Court to find that his subjective belief that he was discriminated against based on his disability is sufficient to establish direct evidence of disability discrimination and defeat Defendant's Motion for Summary Judgment. But the actual facts in this case show that there is no support for Griffin's claim. His termination from the College Intern Program was due to his poor work performance and unprofessionalism, not because of his alleged disabilities. Griffin's underwhelming performance is well documented in his quarterly reports and email messages from his supervisor. Griffin significantly lagged behind other interns, he was frequently away from his workstation, displayed a lack of focus, failed to accurately record his time and attendance, displayed unprofessional behavior including personal telephone conversations during work, and had difficulty completing the assigned work accurately and timely. Therefore, while Griffin may have believed he was being discriminated against, that belief is not supported by fact, and he has not established a sufficient claim for either direct or indirect discrimination.

## I.  BACKGROUND

The full factual background of this case is set forth in detail in Defendant's Motion for Summary Judgment (ECF No. 34) and will not be repeated here. Defendant points out, however, that the facts set forth by Griffin simply do not add up to actionable disability discrimination. In addition to being insufficient to establish any claim for disability discrimination, a significant number of statements made in Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Response") are not supported by the cited record and mischaracterize the evidence before the Court. As such, Defendant will address or expand on some of the pertinent facts referenced by Plaintiff in his Response.

To begin, Griffin is fixated on Souvannavong to the point of making completely unsupported assertions about her actions and comments. He accuses Souvannavong of "outlin[ing] to Swiggum a demand to subject Griffin to intensive scrutiny as to his use of time and the accuracy of the performance of his duties with the purpose of getting him out of the department." (ECF No. 35, Pl.'s Resp. at PageID 1535). But Swiggum's testimony cited in support of this assertion does no such thing. (ECF No. 29, Swiggum Dep. at PageID 1195–96). Missing is any evidence that Souvannavong engaged in the alleged scheme for the purpose of "getting [Plaintiff] out of the department." In fact, Swiggum expressly denies that Souvannavong wanted him to write up Plaintiff at that time to "get him out of there." (*Id.* at PageID 1196).

Continuing this vendetta against Souvannavong, Griffin states, without any support, "Souvannavong's claim that she made that statement regarding overall performance is not credible, given Griffin had only been on the floor a few weeks." (ECF No. 35, Pl.'s Resp. at PageID 1535).[1] Plaintiff cites no evidence that would undermine Souvannavong's credibility

---

[1] "[T]he statement" refers to Souvannavong allegedly stating "I don't want that in my branch" in reference to Griffin. (ECF No. 29, Swiggum Dep. at PageID 1194; ECF No. 28, Souvannavong Dep. at 1142–43).

with respect to this statement. Rather, Ms. Souvannavong had a sufficient period of time, nearly a month, to observe Griffin's performance issues and hear about Griffin's performance issues from his supervisors, Swiggum and Skaggs. (ECF No. 26-1, ROI at PageID 537–44). Neither can Griffin provide any evidence that any alleged conduct or statement made by Souvannavong after her early statement to Swiggum was animated by her knowledge of Griffin's disability or her discrimination against Griffin because of his disability. Griffin's Response is, predictably, heavy on inference, innuendo, and assumption, but light on any facts supporting his claim.

In addition, Plaintiff makes a number of claims regarding Souvannavong that are supported only by his own self-serving testimony. (*Id.* at PageID 1538–39). In particular, Plaintiff claims that Souvannavong prevented him from using a close by restroom, as it was a "privilege" he had not "earned." (*Id.* at PageID 1538). This allegation is simply not supported by any documents or testimony by any other party. Plaintiff's own counsel referred to this alleged episode as "something bizarre" when questioning Swiggum about these allegations, and Swiggum denied any knowledge of this episode or any rules about who could use certain restrooms. (ECF No. 29, Swiggum Dep. at PageID 1237–38).

Griffin's attempts to attack the training program—or the alleged lack thereof—similarly miss the mark. He plainly asserts that "[t]here was no training program set up in QM for Griffin," and that "[t]his was an oversight that was to have been corrected previously, but no action was ever taken." (ECF No. 35, Pl.'s Resp. at PageID 1534). The testimony cited by Plaintiff to support these assertions do not actually support either statement.[2] Koukourakis testified that he had

---

[2] Unfortunately, this is a recurring issue with Plaintiff's Response that makes it difficult to trust any of the cited evidence as actually supportive of the corresponding "factual" statements in his brief. For instance, in reference to the September 10, 2019 email sent by Koukourakis to Souvannavong and Swiggum, Plaintiff states "[i]n the end, Swiggum acknowledged that no real action was taken in response to Koukourakis' email." (ECF No. 35, Pl.'s Resp. at 5). Plaintiff cites to Swiggum's deposition testimony, PageID 1234, in

requested an overall training program for college interns be created, but that at the time

Plaintiff's training was "up to the individual functional supervisor and a trainer that was provided

by the production floor, the directorate, to initiate training so it was more customized for that

team." (ECF No. 27, Koukourakis Dep. at PageID 1098–99). This means that all college interns

were subject to a customized training plan dependent on their assignments. Moreover, Plaintiff

conveniently ignores the intensive "group effort" training plan instituted for his benefit involving

Dobbins, Skaggs, and Swiggum, among others, and the unprecedented quarter of PACER

training with Jose Arvelo that Plaintiff received. (ECF No. 29, Swiggum Dep. at PageID 1202–

03, 1234–37).

Griffin also attempts to rely on Dobbins's EEO statement to support his claims. In particular,

Plaintiff states, "Dobbins stated unequivocally that Souvannavong was responsible for Griffin's

removal through false claims to upper management, and that Swiggum was only able to buy

---

support of this statement. (*Id.*). A review of this evidence reveals that Swiggum simply did not make any such acknowledgment. Here is the testimony from Swiggum's Deposition on PageID 1234:

> Q. Did someone act as a mentor for Mr. Griffin?
> A. I tried to, as best I could, explain to him and show him repeatedly what he should and needed to be doing.
> Q. Did you feel you had enough time to be that mentor to him?
> A. No, definitely not.
> Q. Mr. Koukourakis, at the end of the first large paragraph, says, "The intern could be assigned a research project that could be done at work," and so on. Was that ever done with Mr. Griffin?
> A. Well, Mr. Griffin was not like most college interns in the fact that he was full-time, so he needed a full-time workload as well. I don't remember him being given a specific research project, but he had a lot of work products.
> Q. Prior to that, in that same paragraph, Mr. Koukourakis expressed, "The intern should be offered rotational opportunities to other areas of L&M so the intern can learn about contracting, quality assurance, material planning, demand planning, et cetera." Was that done?
> A. I don't recall.

(ECF No. 29, Swiggum Dep. at PageID 1234).

Griffin a couple of additional weeks at the end." (ECF No. 35, Pl.'s Resp. at PageID 1539). A closer review of Dobbins's statement undermines its support for Plaintiff's claims. First, Dobbins's statement is based purely on his own subjective belief, and not on any facts Dobbins could provide at the EEO stage or otherwise. (ECF No. 26-1, ROI at PageID 917). Second, and to that point, Dobbins's actual knowledge of Plaintiff's situation is lacking in several material respects. Dobbins testified that he did not find out about Griffin's termination until after it had occurred, had no knowledge of whether other supervisors had recommended termination, had no knowledge of other college interns being terminated, was apparently unaware that Griffin received an entire quarter of in-person PACER training, and had never terminated anyone in his time as a supervisor. (*Id.* at PageID 917–18). Third, Dobbins also testified that he did not have *any* evidence that Griffin was discriminated against based on his disability. (*Id.* at PageID 918). Fourth, to the extent Dobbins took issue with Souvannavong and her management of QMAC, his complaints were plainly global, stating "[s]ince Ms. Souvannavong has been in our area she has created a hostile work environment not only for him but *everyone else on the team as well*, we have team members trying to leave our team because of her . . . ." (*Id.* at PageID 915 (emphasis added)). This is at most evidence that Dobbins had issues with Souvannavong as a supervisor, and not evidence of any particularized discrimination against Griffin.

The final section in the Response's "Statement of Pertinent Facts" that bears addressing is Griffin's description of the final decision to terminate his employment. (ECF No. 35, Pl.'s Resp. at PageID 1540–43). In this section, Plaintiff takes issue with the email Lieutenant Commander DiPaolo sent to Koukourakis requesting Griffin's reassignment, stating "DiPaolo cited any and all negative areas set forth in prior Quarterly Reports without providing said reports and also without stating any of the positive areas and areas of improvement." (*Id.* at PageID 1540).

Koukourakis received and reviewed every single one of Griffin's Quarterly Reports in their entirety when the reports were generated. (ECF No. 27, Koukourakis Dep. at PageID 1089 ("I reviewed them each quarter. They would be forwarded to me by Mr. Swiggum.")). That is to say, Koukourakis was well aware of Plaintiff's strengths and weaknesses prior to any email from Lieutenant Commander DiPaolo, and any implication that Lieutenant Commander DiPaolo was hiding the ball has no factual foundation.

Griffin also relies on a tortured reading of Colonel Payne's deposition testimony and other evidence to reach the conclusion that Colonel Payne simply rubber-stamped his termination. Plaintiff claims, without any evidentiary support, that "[Colonel] Payne's description of his review was that it was cursory at best." (ECF No. 35, Pl.'s Resp. at PageID 1542). This is coupled with Plaintiff's assertions that Colonel Payne "failed to notice that not all of Griffin's Quarterly Reports were in the packet," and that "[t]he HR recommendation was literally one non-descriptive sentence, which [Colonel] Payne never asked to be illuminated by the reasoning behind it." (*Id.*). But reviewing Colonel Payne's cited deposition testimony reveals just how misleading these assertions are. Colonel Payne's words speak for themselves:

> Q. Kathleen's E-mail is one sentence. Did you ask her or talk to her to get any illumination on that one sentence?
>
> A. I do not know.
>
> Q. Did you talk to anybody during this process, any of the managers or anybody from HR during this process to see whether -- you know, what they thought about Mr. Griffin?
>
> A. Yeah. And, Mr. Reeve, like I said, this was three years ago. So telling you specifically who I talked to in this specific matter is going to be challenging. Again, that was a long time ago. All I can tell you is the process that I normally follow. I would review the package; and, yes, I would talk to the senior leaders that are making comments or that have pertinent information about the action that we're about to take. So going back I can't specifically say I talked to her, but I can say that that would have been a normal course of action to talk to all parties involved to understand the situation.

* * *

Q. All right. There's two other quarterly reports in here, and that's July through September of 2019 and January through March of 2020. But there's one missing. Did you pick up on that, that there was a QR report that was not made a part of the packet?

A. I do not remember if I picked up on that or not.

(ECF No. 31, Payne Dep. at PageID 1304–05, 1309). Colonel Payne's limited testimony does not vindicate Plaintiff's theory that Souvannavong somehow guided this process from the beginning—it only undermines it. Griffin's recitation of the "facts" relies on a twisted portrayal of the evidence, which is unfortunate given the extensive, independent process that led directly from Griffin's underperformance and inconsistency to his termination.

Ultimately, Griffin's recitation of the "facts" in this case suffers from two major flaws. First, reviewing each of the alleged events and statements set forth by Griffin, none constitute evidence that DLA discriminated against Griffin—directly or indirectly—because of his disability. Regardless of their veracity, complaints about job responsibilities, training, mentorship, scrutiny in the office, and organizational structure are routine complaints lodged by employees everywhere and are not evidence of disability discrimination. Griffin cannot simply paint all the issues he experienced during him time at DLA with a discriminatory brush based on a single, ambiguous statement by a supervisor with no authority over his ultimate employment. Second, Griffin's mischaracterization of basic facts in this case to suit his ends fatally undermines his credibility and his claim. Griffin attempts to portray his termination as an extended, nefarious scheme orchestrated by Souvannavong, however, the vast majority of the incidents Griffin complains of occurred during the first few months of his employment. In reality, throughout Griffin's tenure at DLA, he significantly lagged behind other interns, did

incomplete work, and required focused oversight above and beyond what was expected at that point in his tenure.

## II. DISCUSSION

Griffin asserts that he can prove his claim of disparate impact disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 791, *et seq.*, through direct evidence, but he fails to show a single instance where he was subject to discrimination based on his disability. Griffin also suggests he has satisfied all the elements for a prima facie case of disability discrimination yet fails to address the final element. Finally, Griffin cannot prove that DLA's legitimate, non-discriminatory reason for terminating Griffin is pretext.

This Court should look closely at Griffin's documented work performance during his trial period at DLA which proves that Griffin repeatedly made the same mistakes. After over a year of employment, Swiggum summarized Griffin's performance in a July 21, 2020 email stating, in part "[y]ou have shown great improvements, but similar trends have been observed and documented in your quarterly reports, and to some extent, have continued to occur after they have been brought to your attention repeatedly." (ECF No. 26-2, ROI at PageID 817–18). Those trends that Griffin continued to repeat were failing to retain information on which he was trained, failing to record time properly, extensive time away from his workstation, not completing assignments accurately, not taking full responsibility for his actions, not showing improvement on formatting and using proper grammar in his communications, failing to ask for help when needed, and not saving his work. (*Id.*; ECF No. 28, Souvannavong Dep. at PageID 1154). Griffin himself admitted that he had difficulties working at DLA. Griffin stated that he would get "tripped up" and that "it was just honestly just me struggling." (ECF No. 26, Griffin Dep. at PageID 281, 273).

Swiggum repeatedly told Griffin that he needed to take responsibility for his actions and Griffin is still failing to do so and admit that it was his performance that led to his termination, not discrimination. (ECF No. 26-2, ROI at PageID 817–18). Griffin failed to pay attention when being trained and failed to retain information he was trained on. Griffin even admitted, "I was not good at taking notes." (ECF No. 26, Griffin Dep. at PageID 321). Instead of taking responsibility for his own failure to retain information and successfully perform the assigned tasks, he blames Souvannavong for his failures. In addition to informing Griffin directly that he continued to make some of the same mistakes, Swiggum noted in a Skype chat to Souvannavong on April 15, 2020, that "[Griffin] is progressing but regressing in other areas . . . i [sic] guess his DLA / CAS knowledge is progressing . . . but basic things we've discussed several times he just doesn't take serious [sic] and he's still not doing it." (ECF No. 34-5, Swiggum Decl. at PageID 1502).

This is not the case of one or two mistakes pointed out to discriminate as Griffin would like the Court to believe. Griffin could not successfully perform the required tasks of a college intern, nor was he performing at a level at which DLA would consider converting him to the PACE Program, and ultimately hire him as a full-time employee. Accordingly, DLA terminated Griffin for poor performance during his trial period.

## A. Griffin failed to provide any direct evidence that he was discharged solely because of his disability.

Griffin asserts that Souvannavong's comment about not wanting "that" in her department and her subsequent actions were all part of an orchestrated plan to have him removed. (ECF No. 35, Pl.'s Resp. at PageID 1545). In reality, Swiggum made Souvannavong aware of Griffin's poor performance and unprofessional behavior early in his trial period, and she was supervising Griffin to attempt to correct these behaviors and "ensure that he is successful in his training."

9

(ECF No. 28, Souvannavong Dep. at PageID 1151, 1163–64). Griffin's allegations of discrimination by Souvannavong amount to nothing more than a rigorous supervisor regularly observing the actions and work product of a new employee about whom she had concerns.

DLA does not dispute that Souvannavong was a very demanding supervisor. In fact, other employees said she made the entire QMAC branch a "hostile work environment." (*See* ECF No. 26-2, ROI at PageID 915; 899–900). And Griffin stated that from the very beginning he heard that Sally had a difficult reputation. (ECF No. 26, Griffin Dep. at PageID 200–01; 220). Souvannavong demanded a high level of performance in her branch from everyone, and that is not evidence of discrimination. *Holt v. JPMorgan Chase Bank, N.A.*, No. 3:07-CV-471-R, 2009 WL 982751 at *5 (W.D. Ky. Apr. 13, 2009) ("[N]umerous criticisms and increased scrutiny [do not] amount to discriminatory conduct.").

Notably, these alleged actions by Souvannavong occurred within the first few months that Griffin was with QMAC.[3] Griffin complained to his supervisor Koukourakis, who then explained to Souvannavong and Swiggum that Griffin needed more mentoring and supervision. (ECF No. 26-2, ROI at PageID 774–75). The evidence in this case shows that Griffin received mentoring and guidance. Griffin never made any further complaints to Koukourakis or anyone else with the College Intern Program for the remainder of his trial period. (ECF No. 26-1, ROI at PageID 374–75). Griffin explains that he asked to be relocated within DLA in the beginning, in the first two to three weeks he was with QMAC and that he also asked to have his seat changed, which was denied due to costs involved. (ECF No. 26, Griffin Dep. at PageID 309–310). And then after the early complaints, Griffin did not make anymore. From March 2020 forward,

---

[3] Griffin had more direct contact with Souvannavong during the first few months of his employment while Swiggum was on paternity leave. Upon Swiggum's return, he resumed his duties as Griffin's supervisor and mentor.

Griffin was teleworking due to the COVID-19 pandemic and his feelings of being watched and his seating were no longer an issue.

Additionally, Griffin describes that from the first day he arrived at QMAC, "It wasn't how I thought it would go. It wasn't easy. When I got to the floor, I kind of felt like I wasn't really welcomed . . . . I guess I didn't really feel like they wanted to have me up there. I mean, that's how I felt at least." (ECF No. 26, Griffin Dep. at PageID 165). He again stated, "a lot of this stuff was happening, you know, when I first got to the floor. And I'm like, well, it wouldn't necessarily matter what I do. If you don't want somebody there, anything that you do is just going to want to just urge you to just, you know, want to get rid of somebody." (*Id*. at PageID 224). The timing of these allegations is important as Griffin felt like he was not welcomed from the very beginning, even before anyone knew about his alleged disabilities. The fact that Griffin did not feel welcomed by Souvannavong and other members of the QMAC branch from the beginning before they even knew about his disability only illustrates that QMAC employees simply did not have the time to dedicate to interns as it added more work to their already busy schedule.

None of the references Griffin makes in his Response are direct evidence of disability discrimination. Direct evidence is that which requires no inferences and "essentially requires an admission in some form by the employer that it relied on the disability in making an employment decision." *Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 844 (6th Cir. 2018) (quoting *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002)); *Lai Ming Chui v. Donahoe*, 580 F. App'x 430, 437 (6th Cir. 2014) ("Chui presented testimony from her supervisors suggesting that Woods had a problem with people on limited-duty assignments . . . [and] clearly suggesting that Woods considered Chui's disability in making the employment

11

decision . . .."). Griffin's case is built on inferences upon inferences, and there has been no admission that DLA relied upon Griffin's disability in making the decision to terminate him.

Griffin's reliance on Souvannavong's remark about not wanting "that" in her department is misplaced because this is merely an isolated comment. Griffin was not even aware of the statement when it was made. Isolated comments—even if related to a plaintiff's protected status which this was not—cannot serve to connect alleged harassment with purported discriminatory animus if the plaintiff was unaware of such comments or sentiments at the time of the conduct at issue. *See, e.g.*, *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 128 n.5 (6th Cir. 2007).

Further, Souvannavong was outside of the decision-making process for Griffin's termination. At most, she was involved in recommending reassignment to another department. At no time did she direct anyone to terminate Griffin. (ECF No. 34-2, Koukourakis Decl. at PageID 1465–66). Accordingly, her isolated and ambiguous comment cannot constitute direct evidence of discrimination. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002) (holding that comments which are isolated or ambiguous and which are made by individuals outside of the decision-making process with respect to a plaintiff's termination cannot constitute direct evidence of discrimination.); *see also Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003); *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004); *Suits v. The Heil Co.,* 192 F. App'x 399, 407 (6th Cir. 2006) ("[S]tray remarks, particularly those made by a person other than a decision-maker, are not enough to show discrimination")

Souvannavong's statement was not only isolated, but also ambiguous. There is no evidence that the statement was regarding Griffin's disabilities. Souvannavong suggests that she was referencing the issues Swiggum raised about Griffin's performance. (ECF No. 28, Souvannavong Dep. at PageID 1161). Swiggum confirmed that, during this conversation, he also discussed with

Souvannavong Griffin's performance and his relationship with White. (ECF No. 34-5, Swiggum Decl. at PageID 1501).

Additionally, the increased scrutiny Griffin describes—namely, reporting when he was or was not at his desk and Souvannavong allegedly observing him in the workplace—is not evidence of discrimination. *See Holt*, 2009 WL 982751 at *5 ("[N]umerous criticisms and increased scrutiny [do not] amount to discriminatory conduct.").

As noted above, direct evidence is that which requires no inference to conclude that the employer made an employment decision based on prejudice against members of a protected class. In this case, Souvannavong's comment, even if taken as true, does not "require[] the conclusion," that Griffin's alleged disabilities were the sole basis for his termination. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006).

**B. Griffin cannot prove DLA is liable for discrimination based on the "Cat's Paw" Theory.**

Griffin concedes that Souvannavong "was not the final decision maker," but nonetheless argues that she "pulled the strings and manipulated the players and eventually accomplished the deed." (ECF No. 35, Pl.'s Resp. at PageID 1546). This "cat's paw" theory, a variation on vicarious liability, is a theory where a plaintiff "seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568, 582 (6th Cir. 2022) (citing *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017)). The inquiry thus focuses on whether "another individual and not the actual decision maker is the driving force behind the employment action." *Id.* (citing *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 420 (6th Cir. 2021). Plaintiff relies on *Staub v. Proctor Hosp.*, 562 U.S. 411, 422–23 (2011), but the facts in that case differ greatly from those before this Court. In *Staub*, there was overwhelming evidence that the supervisors' actions were "based on

discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision" and were causal factors in the decision to fire Staub. *Id.* at 421–23. Specifically, the Court found there was evidence that Staub's supervisors' actions were motivated by hostility toward Staub's military obligations as an Army Reservist which required him to attend drill one weekend per month and to train full time for two to three weeks a year. One supervisor stated that Staub's "military duty had been a strain on the department," and that she was trying to "get rid of" him and another supervisor was described as "out to get" Staub. Further, one supervisor called Staub's military duties "Army Reserve bullshit" and said they were "a b[u]nch of smoking and joking and [a] waste of taxpayers['] money." *Id.* at 413–14. Additionally, Staub's supervisor scheduled him for additional shifts without notice so that he would "'pa[y] back the department for everyone else having to bend over backwards to cover [his] schedule for the Reserves.'" *Id.*

In *Boughton v. Garland*, 2022 U.S. Dist. LEXIS 56342, *37 (S.D. Ohio Mar. 29, 2022), this Court recently considered this "cat's paw" theory and found that the allegedly illicit motives of the supervisor should not be imputed to defendant. The Court first considered whether the subordinate or supervisor was in fact biased, as "a predicate to cat's paw, [plaintiff must] establish that the record supports [discriminatory] animus" on the part of the supervisor. *Id.* at *38. It "requires a showing of prejudice, spite, or ill will." *Id.* (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012)). Next, the Court considered whether the ultimate decisionmaker conducted his own investigation that "results in an adverse action for reasons *unrelated* to the supervisor's original biased action." *Id.* (quoting *Staub*, 562 U.S. at 421).[4]

---

[4] In *Boughton*, the Court found that plaintiff lacked direct evidence of retaliation, even under a cat's paw theory, so she sought to prove the retaliation claim relating to her termination by circumstantial evidence, for which courts utilize the *McDonnell Douglas* burden-shifting framework. This Court noted that "creates a bit of a wrinkle right at the outset, though, as whether—and how—the cat's paw theory fits with

Here, Griffin merely references the "cat's paw" theory but fails to apply the standard to the facts of this case. He failed to provide evidence demonstrating that Souvannavong showed prejudice, spite, or ill will toward him. *Boughton*, 2022 U.S. Dist. LEXIS 56342, *38. To attempt to show some prejudice by Souvannavong, Griffin relies on:  Souvannavong's isolated comment about not wanting "that" in her branch; Swiggum's statement that Souvannavong wanted him to "assign [Griffin] work products, and, you know, keep track of his time" (ECF No. 29, Swiggum Dep. at PageID 1196); and that Souvannavong was requesting Griffin to email her when logging on and off each day and to tell her what he accomplished each day. (*Id.* at 1197). Griffin also generally describes feelings of paranoia and a persistent fear that he was being watched. (ECF No. 26, Griffin Dep. at PageID 193 ("I always felt like somebody was watching me. I started to get paranoid a bit … there was always a constant fear of somebody watching me. It didn't matter what I did.")). However, all of these allegations combined do not show prejudice, spite or ill will toward Griffin. Griffin's testimony simply illustrates that he was "paranoid" and believed Souvannavong was out to get him. But his subjective beliefs are insufficient to survive summary judgment. *Douglass v. United Serv's Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) ("It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion . . ..").

---

the *McDonnell Douglas* framework is not an entirely settled issue within the Sixth Circuit." *Boughton*, 2022 U.S. Dist. LEXIS 56342, *36. Therefore, if Griffin fails to establish a prima facie case of disability discrimination, the Court need not analyze the cat's paw theory with respect to the prima facie case. *See, e.g., Marshall*, 854 F.3d at 379-80 (analyzing the *McDonnell Douglas* framework before proceeding to the cat's paw theory); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (same); *see also Southern v. BASF Corp.*, No. 1:19-CV-00067, 2020 U.S. Dist. LEXIS 48399, 2020 WL 1322842, at *8 (N.D. Ohio Mar. 20, 2020) (following this approach and finding it unnecessary to analyze the cat's paw theory because plaintiff had failed to establish prima facie case of race discrimination).

Further, Griffin fails to provide any evidence that Souvannavong was persuading the ultimate decision makers to terminate Griffin. Koukourakis compiled all of Griffin's records and forwarded the information to Kinstlinger, who ultimately forwarded the information to Colonel Payne, who made the final determination. Even before that, Swiggum and DiPaolo wrote emails requesting Griffin be reassigned. Souvannavong was not involved in this process. Rather, QMAC's recommendation to reassign Griffin was merely passed up the chain of command, with Kinstlinger and Payne ultimately doing their own independent review of Griffin's file.

## C. Griffin fails to set forth a prima facie case of disability discrimination under the Rehabilitation Act.

Absent direct evidence of discriminatory intent, Griffin's disability discrimination claim is analyzed under the *McDonnell Douglas* burden-shifting framework. Griffin must establish a *prima facie* case of disability discrimination; if he meets this initial burden, then the burden shifts to Defendant to provide a legitimate, non-discriminatory reason for terminating him. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The burden then returns to Griffin to attempt to prove that DLA's legitimate justification was somehow pretextual. *Id.* at 846.

Griffin must establish a *prima facie* case by demonstrating "(1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007); *see also Mitchell*, 738 F. App'x at 846 n.6 (noting *Jones*'s five-factor test remains the appropriate standard for establishing a *prima facie* case under the Rehabilitation Act). "The final element may also be satisfied by showing that 'similarly situated non-protected employees were treated more favorably.'" *Spence v. Donahoe*, 515 F. App'x 561, 567–68 (6th Cir. 2013)

(quoting *Jones*, 488 F.3d at 404 (6th Cir. 2007)). In its Motion for Summary Judgment, DLA set forth a full analysis applying the aforementioned standard, including arguments as to why Griffin cannot satisfy the second and fifth elements, and its full analysis will not be repeated here.

In his Response to DLA's Motion for Summary Judgment, Griffin has failed to set forth a prima facie case for disability discrimination under the Rehabilitation Act. Griffin asserts that he was disabled under the statute, that he was qualified to perform the position with or without a reasonable accommodation, and that he was discharged solely because of his disability. Griffin then jumps to the burden shifting analysis, failing to even mention the fifth element of the prima facie case, that he was replaced by a nondisabled person or that similarly situated non-protected employees were treated more favorably.

Summary judgment should be granted to the employer when plaintiff fails to present any evidence regarding similarly situated comparators. In *Watson v. Kraft Foods*, No. 2:06-cv-163, 2007 U.S. Dist. LEXIS 13414, 2007 WL 666620, at *9 (S.D. Ohio Feb. 27, 2007), this Court found plaintiff failed to show a genuine issue of material fact exists regarding his disparate treatment claim under the ADA when he failed to present any evidence regarding non-disabled employees who were otherwise similarly situated to the plaintiff. Likewise, in *Ramsey v. Hamilton Cnty. Sheriff's Dept.*, No. 1:05-cv-116, 2006 WL 1207984, at *4 (S.D. Ohio May 3, 2006), the defendant was entitled to summary judgment when plaintiff failed to identify non-disabled, similarly situated employees who engaged in materially similar conduct and did not face similar consequences. Finally, in *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 659 (6th Cir. 1999), the Sixth Circuit held that a claim for disparate treatment requires evidence that plaintiff was treated differently than an employee who was similarly situated in all material respects. Accordingly, because Griffin completely ignored this factor in his Response, he has failed to

17

provide any evidence of similarly situated, non-disabled comparators and therefore cannot establish a prima facie case of disability discrimination.

## D. DLA's legitimate, non-discriminatory reason for Griffin's termination was not pretextual

Griffin argues that DLA's legitimate, non-discriminatory reason for his termination—poor performance and unprofessionalism[5]—are pretext because his "ability to perform his job tasks was adequate for a Student Intern," the "time recording issue was de minimis and quickly corrected in every case, and Griffin never 'stole time.'" (ECF No. 35, Griffin's Resp. at PageID 1548–49). However, Griffin has failed to "produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

To establish pretext, Griffin must show: (1) that the employer's reason has no basis in fact; (2) the reason did not actually motivate the employer's adverse employment action; or (3) that the reason was insufficient to motivate the adverse employment action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008); *Jones*, 488 F.3d at 406. As set forth in detail in Defendant's Motion for Summary Judgment, the objective evidence justifies DLA's decision to terminate Griffin: Griffin's quarterly performance reports, the numerous emails messages, and the deposition testimony, establishing that Griffin was not successfully completing his assigned tasks. Griffin wants the Court to believe that he was performing "adequately" because Swiggum

---

[5] DLA's legitimate, non-discriminatory basis for terminating Griffin is outlined in the Motion for Summary Judgment, which includes his documented poor performance and unprofessionalism. These are common legitimate reasons for termination. *See Smyr v. Kroger Ltd. P'ship I*, No. 3:20-cv-114, 2022 U.S. Dist. LEXIS 125389 at *19 (S.D. Ohio July 14, 2022) ("Even if [plaintiff] could advance past the *prima facie* stage, he cannot overcome the undisputed evidence that [defendants] fired him for his poor performance."); *Smith v. AdvancePierre Foods, Inc.*, No. 1:18-cv-242, 2020 U.S. Dist. LEXIS 113162 at *32 (S.D. Ohio June 26, 2020) ("The Sixth Circuit has long recognized that sub-standard job performance and/or insubordination are legitimate, non-discriminatory reasons for firing employees.").

praised Griffin's improvement in some areas in his final quarterly report. But there is no dispute that while Griffin would improve in some areas, he continued his poor performance in others.

Moreover, the mere presence of some positive comments on his quarterly reports does not reflect successful performance sufficient to show pretext as a matter of law. *See Shulman v. Amazon.com, LLC*, 2015 U.S. Dist. LEXIS 51291, *29–30 (E.D. Ky 2015) (Employee with some positive notes in his file struggled to meet productivity standards terminated "because he failed to meet performance criteria, despite numerous chances to improve" was legitimate, non-discriminatory reason for termination and employee could not prove pretext); *Weaver v. City of Twinsburg*, 580 Fed. Appx. 386, 394 (6th Cir. 2014) ("While the performance review was generally favorable, it does note several areas that 'need improvement,' including [plaintiff's] ability to work and cooperate with coworkers" constituting a legitimate, non-discriminatory reason for her termination.).

Griffin can offer no explanation for his continued struggles at DLA or his quarterly review ratings; instead, he offers mere speculation well after the fact that Souvannavong wanted to get rid of him because he was disabled. Griffin's subjective beliefs are not sufficient to establish pretext. *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) ("To establish pretext, a plaintiff cannot merely rely on his subjective belief that discrimination has occurred . . .."). Griffin himself admitted his struggles during his employment, that he would get "tripped up" and that "it was just honestly just me struggling." (ECF No. 26, Griffin Dep. at PageID 281, 273). He further acknowledges that in three out of four of his quarterly reviews he received "Needs Improvement." Griffin, like the plaintiff in *Most*, "does not explain how an illegal motivation was more likely, despite the complaints regarding his unsatisfactory progression." *See Most*, 743 Fed. App'x at 669.

A plaintiff's disagreement over the facts does not create a genuine issue of material fact "as long as an employer has an honest belief in its proffered nondiscriminatory reason." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "An employer has an honest belief in its reason" when it "reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski*, 274 F.3d at 1117 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Griffin himself described his incorrect, preconceived notion that this was a "lax job," and unfortunately, he performed like it was a lax job. (*Id.* at 194). Colonel Payne, evaluating Griffin's "full body of work" through the staff summary sheet and conversations with senior staff, ultimately opted to terminate Griffin rather than reassign him as requested by Lieutenant Commander DiPaolo who summarized Griffin's work as "always incomplete or requires focused oversight that is above and beyond what we would expect at this point in his tenure here. He significantly lags behind QMA's other interns." (ECF No. 26-1, ROI at PageID 733–34; ECF No. 31, Payne Dep. at PageID 1273–76). DLA documented Griffin's poor work performance for over a year and Griffin was told by his direct supervisor Swiggum more than once that he would not be recommended for the PACE Program. Griffin cannot provide any evidence that he was discriminated against based on his disabilities, let alone that the reasons for his termination were pretext for disability discrimination. Accordingly, the Court should grant summary judgment to Defendant on Griffin's disability discrimination claim.

### III.   CONCLUSION

For the reasons set forth in detail above, the Court should grant summary judgment to Defendant Lloyd J. Austin, III, Secretary, U.S. Department of Defense.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/ *Stephanie M. Rawlings*
STEPHANIE M. RAWLINGS (0075068)
W. HUNTER WEST (0093445)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Telephone: (614) 469-5715
Facsimile: (614) 469-5240
Email: stephanie.rawlings@usdoj.gov
Email: hunter.west@usdoj.gov