# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**SEMA'J GRIFFIN,**

      **Plaintiff,**

  v.                                              Civil Action 2:21-cv-3922
                                                  Magistrate Judge Kimberly A. Jolson

**LLOYD AUSTIN, SECRETARY OF DEFENSE,**

      **Defendant.**

## OPINION AND ORDER

This matter, in which the parties consented to the jurisdiction of the Magistrate Judge (Doc. 8), is before the Court on Defendant Secretary of Defense's Motion for Summary Judgment (Doc. 34). For the reasons that follow, the Motion is **GRANTED.**

### I.     BACKGROUND

Plaintiff SeMa'j Griffin was an intern with Defense Logistics Agency ("DLA"), an agency within the U.S. Department of Defense, from May 2019 to August 2020 through the College Intern Program ("the Program"). (Doc. 26 at 29:15–16; *id.* at 194:15–18). The Program was created to "attract students . . . with paid opportunities to work in agencies and explore Federal careers while still in school. [The] Program expose[d] students to jobs in the Federal civil service by providing meaningful developmental work at the beginning of their careers before their careers [sic] paths are fully established." (Doc. 26-2 at 118 (overview of DLA Pathways Internship Program as described in Memorandum of Understanding)). The Program delegates responsibilities to interns, including managing inventory, solving customer problems, typing, filing, copying, and performing data entry. (*Id.* at 186; Doc. 31-1 at 11).

Plaintiff was hired for the Program by its then manager, Craig White, who is also Plaintiff's stepfather. (Doc. 26 at 36:5–24, 37:1–6). During his tenure, Plaintiff was assigned to the Land and Maritime Division, Customer Operations, Surface Cell Group ("QMAC") (*see* Doc. 26 at 46:8–9) and had several supervisors. Within the Program, White and George Koukourakis—who absorbed some of White's responsibilities after White was investigated for favoritism (*see* Doc. 26-3 at 98; Doc. 27 at 27:23–28:21)—supervised Plaintiff. (Doc. 26 at 36:5–14, 37:14–21). They were Plaintiff's official supervisors, but Plaintiff also had functional supervisors within QMAC. (Doc. 26-3 at 92–93*).* At various times, Michael Swiggum and Derek Dobbins were Plaintiff's functional supervisors and were responsible for overseeing Plaintiff's training and work assignments. (Doc. 26 at 50:5–17; Doc. 26-3 at 93). Above Swiggum and Dobbins was Sally Souvannavong, and she too supervised Plaintiff. (Doc. 28 at 7:6–10).

From the start, Plaintiff's internship did not go well. Plaintiff expressed being thrown off by what he considered "some real high expectations for an intern." (Doc. 26 at 45:12–16). And, admittedly, he "didn't really know much," (*id.* at 45:5), so, within a few weeks of joining QMAC (around August 2019), Swiggum trained him on relevant protocols. (*See* Doc. 29 at 10–11). During that training, Swiggum noticed that Plaintiff was distracted—taking out his phone, texting, and generally not paying attention—so he contacted White, who informed him of Plaintiff having ADHD and Tourette syndrome. (*Id.*). Swiggum then simultaneously informed Souvannavong of his newfound knowledge of Plaintiff's disability, his work performance, and his familial relationship with White. (Doc. 34-5 at 2). In response, Souvannavong said, "I don't want that in my Branch." (*Id.*).

A few days thereafter, Swiggum contacted the Reasonable Accommodation office to allow for Plaintiff to begin the accommodation request process. (Doc. 26-3 at 29–31). Plaintiff never

asked Swiggum for an accommodation (Doc. 34-5 at 2). Nonetheless, he began the process of formally requesting an accommodation for frequent breaks through the Reasonable Accommodation office. (*See* Doc. 26-1 at 112). But he never completed the process because he did not provide sufficient documentation of his disability. (*Id.* at 203). Without a complete application, his request could not be considered. (*Id.*).

Beginning on August 13, 2019, Swiggum was on paternity leave for three weeks (Doc. 26-1 at 92). During that time, Plaintiff reported to Dobbins and Souvannavong. (Doc. 28 at 8:11–14). Souvannavong required Plaintiff to email her when logging on and off for the day and to provide a daily work report. (Doc. 29 at 15:13–17). She was later told "by leadership" to stop these requirements. (*Id.* at 15:18–22).

When Swiggum returned from leave, he resumed his role as Plaintiff's functional supervisor and trained him one-on-one on at least three separate occasions. (Doc. 26-1 at 91–92). Swiggum provided formal feedback to Plaintiff in October 2019, after approximately three months of Plaintiff working forty hours per week in QMAC. (Doc. 26-1 at 171–78). Swiggum noted that: Plaintiff's performance needed to improve overall; Plaintiff was unorganized; and "no action was taken on the workload" assigned to Plaintiff—three months after the project had been assigned to him. (*Id.* at 175, 177).

From October 2019 to December 2019, Plaintiff spent most of his time training with Jose Arvelo and Diane Skaggs. (*Id.* at 183). In formal feedback, both noted that Plaintiff improved upon relevant skills, but Arvelo said that Plaintiff had room for improvement in identifying and solving problems. (*Id.*). Swiggum again noted that Plaintiff needed to improve his organization and attention to detail. (*Id.*).

In formal feedback from April 2020, Swiggum informed Plaintiff that "he need[ed] to greatly improve . . . moving forward." (*Id.* at 190). He said that Plaintiff "appear[ed] to be going through the motions and not taking work as serious[ly] as he has the potential to." (*Id.*). Plaintiff was "lackadaisical to concerns raised from not only [Swiggum], but [his] counterpart, and the Program Manager of the Interns, about time away from workstation, staying focused and present with task [sic] when at the workstation, and recording time properly." (*Id.*). And Plaintiff never told Swiggum that his frequent absences were connected to his disability. (Doc. 34-5 at 2). In a message to Souvannavong, Swiggum noted that Plaintiff's performance "progress[ed] but regress[ed] in other areas." (Doc. 34-5 at 21). His knowledge about the DLA had improved, but Plaintiff did not implement basic feedback that he and Swiggum discussed numerous times. (*Id.*).

In June 2020, Swiggum spoke with Plaintiff again about his time away from his workstation, his problems with focusing on tasks, and his inaccurate recording of worktime. (Doc. 26-1 at 197). After that conversation, Plaintiff showed "some improvement with time away from workstation[ ] and [was] recording time properly." (*Id.*).

In July 2020, Plaintiff still failed to enter data into the appropriate tracking database, despite being trained on this multiple times. (Doc. 26-1 at 91). Swiggum and Skaggs again provided Plaintiff with formal feedback on July 15, 2020. (*Id.* at 193–98). They noted that Plaintiff's general knowledge of the office remained consistent, and he continued to improve in developing verbal and written communication skills. (*Id.* at 196). Plaintiff "was able to mostly correct issues" and "piece together the knowledge gained," but Swiggum stated that there was "still room for improvement in all areas" and that he was concerned with Plaintiff not fully completing a project. (*Id.*). Fifteen days before his termination, Skaggs emailed Plaintiff about

4

mistakes in his work. (Doc. 26-3 at 33). And she told him again about additional mistakes seven days before his termination. (*Id.* at 34).

Ultimately, Souvannavong's supervisor, Ryan DiPaolo, asked Koukourakis to assign Plaintiff to another office. (Doc. 26-2 at 163). Because they asked that Plaintiff be reassigned outside of QMAC, the Chief of Staff was to review the request and make a determination. (Doc. 27 at 44:16–45:14). In following this procedure, Colonel Payne, Chief of Staff at the time, reviewed a packet on Plaintiff before deciding not to reassign him, but to terminate him. (Doc. 26-3 at 94). The termination was based, in part, upon Human Resources' recommendation for termination. (Doc. 31-3). Koukourakis sent the termination letter to Plaintiff on August 21, 2020. (Doc. 26-1 at 116–17).

Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission, and an investigation began. (Doc. 26-1 at 51; *id.* at 56–58). Notably, in his declaration for the EEOC, Plaintiff stated that he believed Koukourakis terminated him because of the Inspector General investigation of White regarding nepotism and the increased responsibilities from Koukourakis having two jobs. (Doc. 26-3 at 175, 82). Similarly, White answered as follows:

> Q: Did the termination of [Plaintiff's] employment surprise you?
> A: No, it did not for two reasons: 1) I believe the branch chief he was assigned to (Souvannavong) had been trying to get rid of him from the time he was assigned to her team. She got rid of/did not want two other interns who were also black. 2) I believe the upper chain of command terminated [Plaintiff] because of family ties.
> ***
> Q: Do you have any reason to believe [Plaintiff's] employment was terminated because of his disability?
> A: No, I do not.

(Doc. 26-3 at 161–62). The EEOC issued a final agency decision on May 24, 2021, concluding that Plaintiff "failed to establish [that] he was discriminated against based on . . . disability." (Doc. 34-1).

5

Next, Plaintiff initiated this action against DLA and the U.S. Secretary of Defense, alleging he was terminated because of his race and disability and was retaliated against for making complaints of unlawful discrimination. (Doc. 1). Plaintiff amended his Complaint, dismissing the retaliation claim and Defendant DLA. (Doc. 12). After conducting discovery, the pleadings changed again. The parties jointly moved to dismiss Count II of the Amended Complaint, Discrimination on the Basis of Race. (Doc. 24). The Court granted this Motion (Doc. 25), and the case progressed on the remaining single count of discrimination on the basis of disability, in violation of the Rehabilitation Act, 29 U.S.C. § 791 *et seq*.

Now, Defendant brings the instant Motion for Summary Judgment. (Doc. 34). The Motion is fully briefed and ripe for review. (Docs. 34, 35, 36).

## II.    STANDARD

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Liberty*

6

*Lobby*, 477 U.S. at 251–52, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

### III. DISCUSSION

At the outset, the Court notes that Defendant moves for summary judgment on Plaintiff's claims for disability discrimination, hostile work environment, failure to accommodate, and disparate impact. (*See generally* Doc. 34). But Plaintiff's only remaining claim is for disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 791, *et seq*. (*see* Doc. 35), and the Court accordingly addresses only that claim.

A plaintiff can establish an employment discrimination claim by direct or circumstantial evidence. *See Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). Direct evidence requires no inferences and "essentially requires an admission in some form by the employer that it relied on the disability in making an employment decision." *Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 844 (6th Cir. 2018) (quoting *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002)). Here, Plaintiff presents no direct evidence that Defendant unlawfully discriminated against him on the basis of his alleged disability. So he must make his case with indirect evidence under the burden-shifting framework the Supreme Court offered in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973).

#### A. *McDonnell Douglas*

Under *McDonnell Douglas*, the initial burden rests on the plaintiff to establish a prima facie case of disability discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54

7

(1981). If the plaintiff carries that burden, the employer then must provide a nondiscriminatory reason for the adverse employment action. *Id.* at 254–55. If the employer makes such a showing, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is pretext for illegal discrimination. *Id.* at 256.

i. Prima facie showing of discrimination

Here, Plaintiff has alleged illegal discrimination under the Rehabilitation Act. To establish such a claim, a plaintiff must show: (1) he is disabled; (2) he is otherwise qualified for the job, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) his employer knew or had reason to know of his disability; and (5) following the adverse employment action, either he was replaced by a nondisabled person or his position remained open. *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). The last element may be satisfied "by showing that 'similarly situated non-protected employees were treated more favorably.'" *Spence v. Donahoe*, 515 F. App'x 561, 567–68 (6th Cir. 2013) (quoting *Jones*, 488 F.3d at 404).

Only the second and fifth prongs of the prima facia case are disputed here. (Doc. 34 at 30–38). Specifically, Defendant says that Plaintiff was unqualified for the job (prong two), and Plaintiff was not replaced by a nondisabled person or treated unfairly compared to similarly situated non-protected employees (prong five). (*Id.*). Though success on just one of the prongs means a full victory for Defendant, the Court addresses both arguments.

a. Prong Two: Job Qualifications

In order to avoid summary judgment, Plaintiff must present enough evidence whereby a reasonable juror could conclude that he had "the requisite skill[s], experience, education[,] and other job-related requirements" and was otherwise qualified to perform the essential functions of his position as a College Intern. 29 C.F.R. § 1630.2(m) (defining the term "qualified" under the

8

regulations implementing the Equal Employment Provisions of the Americans with Disabilities Act). Defendant argues that the record undisputedly shows that Plaintiff was not qualified: He required constant supervision, was unable to learn his job responsibilities, and failed to maintain the prerequisites for being a College Intern. (Doc. 34 at 31–35).

To understand the parties' positions, the Court first considers a College Intern's "essential functions." *See Bush v. Compass Grp. USA*, *Inc.*, 683 F. App'x 440, 445 (6th Cir. 2017) ("In order to determine whether [Plaintiff] could meet the essential functions of the [job], we must first determine what those essential functions are."). "'Essential functions' are 'the fundamental job duties of the employment position the individual with a disability holds'. . . ." *Id.* (citing 29 C.F.R. § 1630.2(n)(1)). To determine whether a job function is essential, the Court analyzes: "(1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013) (citing 29 C.F.R. § 1630.2(n)(3)).

Helpfully, the job description for College Intern provides:

> Student performs technical supply work necessary to ensure the effective operation of ongoing supply activities. Work requires practical knowledge of supply operation and program requirements and the ability to apply established supply policies, day-to-day servicing techniques, regulations, or procedures. . . . Students must comply with applicable provisions of the SCEP agreement and the requirements established by the employing organization to include - reporting to work as scheduled; . . . adhering to basic work rules and standards of conduct; exhibiting a cooperative attitude in following directions, and maintaining a professional "team-player" approach in dealings with superiors and co-workers.

(Doc. 26-2 at 158). The College Intern also "types, files, copies, performs data entry[,] and does a variety of other general office support/clerical duties." (*Id.* at 186).

With that understanding, the Court turns to the record to determine whether Plaintiff was qualified to be a College Intern, starting with Plaintiff's own description of his abilities. By his own admission, Plaintiff "didn't really know much." (Doc. 26 at 45:5). In fact, he says he "didn't know anything." (*Id.* at 46:3). Particularly, Plaintiff had no "practical knowledge of supply operation[s]" at the start of his internship. (*Id.* at 62:9–14). So Plaintiff admitted that he did not have the required knowledge for the job. (Doc. 26-2 at 158) ("Work requires practical knowledge of supply operation and program requirements and the ability to apply established supply policies, day-to-day servicing techniques, regulations, or procedures.") (*See also id.* at 204:17 (admitting he was "not good at taking notes.")).

And, even after working in the DLA for over a year, Plaintiff was "still trying to figure out what all they do." (*Id.* at 34:12). Plaintiff says he continued to struggle and was consistently told he "wasn't taking initiative to do anything." (*Id*. at 156:8, 157:16–17). Plaintiff says he "was just doing the best [he] could," but his best was "very minimal" because he "did not know much," even after a year as a College Intern. (*Id.* at 188:7–9).

Plaintiff's supervisors similarly assessed his abilities. Plaintiff's first assignment, which lasted eight months, was data entry. (*Id.* at 54:2–12). His functional supervisor, Michael Swiggum, said Plaintiff was unsuccessful with the assignment. (Doc. 29 at 31:12-16 (rating Plaintiff as "Needs Improvement," meaning he was "struggling" and "not performing at the fully successful level")). Swiggum came to this conclusion, in part, because Plaintiff made errors, would forget to save his work, and struggled to use required programs. (*Id.* at 21:6–23; Doc. 26-3 at 117, 120–21).

Notably, Swiggum's evaluation was made through the lens of evaluating a College Intern, who of course has less experience than a seasoned employee. Swiggum testified:

10

> Q: Towards the bottom of this page [of Plaintiff's quarterly report], you say that there is still room for improvement in all areas…. Correct?
> A: Yes.
> Q: Did you consider that to be acceptable to you for a college intern, still room for improvement?
> A: To be acceptable?
> Q: Yes.
> A: I mean, year. He's still in the training position. But this is his probably third or – third quarterly report.
> Q: This is his fourth actually.

(Doc. 29 at 28:12–24). In other words, it is acceptable for an intern, with little to no relevant prior experience, to need room to grow. But as the timeline shows, Plaintiff never meaningfully improved, even though he received frequent training and feedback. (*See id.*; Doc. 26-1 at 183). Plaintiff joined QMAC in August 2019. (Doc. 26 at 46:6–13). He received formal feedback from Swiggum, as well as his trainers, Skaggs and Arvelo, in October 2019, January 2020, April 2020, and July 2020. (Doc. 26-1 at 171–98). The feedback described in detail Plaintiff's weaknesses. (*See generally id.*). Though he improved marginally in some areas (*see, e.g.*, *id.* at 196), he was "lackadaisical" according to Swiggum and still underperformed in many areas. (*Id.* at 190).

At bottom, the record shows that Plaintiff was inconsistent, as were his improvements to performance. (Doc. 29 at 29:18–24). Plaintiff struggled to follow instructions or record his time properly on numerous occasions. (Doc. 26-3 at 124). All told, the record shows Plaintiff was not performing the essential functions of a College Intern.

Still more, Plaintiff became per se unqualified for his position when he failed to maintain the requisite education for his position as a College Intern, under 29 C.F.R. § 1630.2(m). The DLA explicitly outlined its policy and responsibilities for College Interns, which included that they maintain a GPA of 2.95 and notify the College Intern Program Manager if their GPA drops below 2.95. (Doc. 26-2 at 134). But Plaintiff did not maintain a 2.95 GPA during his tenure as a College Intern. During at least two of the approximately six college terms Plaintiff was employed

11

by DLA, his GPA did not rise above 2.66. (Doc. 26-2 at 151–52). The record shows that Plaintiff failed to meet the basic requirements for selection as a College Intern or to stay in the position—namely maintaining a GPA of 2.95.

Accordingly, Plaintiff has not met his burden on this element of the prima facie case. No reasonable juror could conclude that he was qualified to be a College Intern.

*b. Prong Five: Replacement or Favorable Treatment*

Even if a reasonable jury could find him qualified to be a College Intern, Plaintiff has not met his burden of proving prong five in the prima facie case. In order to avoid summary judgment, Plaintiff must establish that, following his termination, "either he was replaced by a nondisabled person or his position remained open" while the employer sought other applicants. *Jones*, 488 F.3d at 404. This prong can "also be satisfied by showing that 'similarly situated non-protected employees were treated more favorably.'" *Spence*, 515 F. App'x at 567–68 (quoting *Jones*, 488 F.3d at 404). Here, QMAC never sought or hired another College Intern after Plaintiff was terminated. (Doc. 34-6 at 2). And the burden is on Plaintiff to dispel any ambiguity as to whether the position remained open. *See, e.g.*, *Lambright v. Kidney Servs. of Ohio*, 998 F. Supp. 2d 676, 687 (S.D. Ohio 2014), *aff'd sub nom. Lambright v. Ohio Thrift Show & Sells*, No. 14-3238, 2014 WL 12972130 (6th Cir. Nov. 14, 2014). Plaintiff has not put forth any evidence that he was replaced by a nondisabled person or that the position remained open while QMAC sought nondisabled applicants, so the key inquiry is whether a similarly situated nondisabled individual was treated more favorably than Plaintiff.

Similarly situated individuals with whom Plaintiff seeks to compare his treatment "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish

12

their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). But an exact correlation with the employee who received more favorable treatment is not required and the Court "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.*; *Bobo v. United Parcel Servs., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

Here, Plaintiff has not set forth enough evidence that a similarly situated nondisabled person was treated more favorably. In his deposition, Plaintiff asserts that fellow interns Zena Park-Reaves and Jake Selker were treated more favorably because they were permitted to transfer to other offices when he was not. (Doc. 26 at 92–101). But, like Plaintiff, Selker was terminated from the Program. (Doc. 26-8 at 65–67). So Plaintiff has not shown that Selker was treated more favorably. More still, Park-Reaves and Selker did not testify by any means in this case, and Plaintiff has not asserted that Park-Reaves and Selker were nondisabled. And the Court cannot make that assumption. With no supporting evidence that these interns were (1) similarly situated, (2) treated more favorably, and (3) nondisabled, the Court cannot and will not conclude that Plaintiff has met his burden. In other words, Plaintiff has not made out a prima facie case of disability discrimination.

ii. Legitimate, nondiscriminatory reason for adverse employment action

Because Plaintiff has not made out his prima facie case, Defendant is entitled to summary judgment. Even assuming, *arguendo*, that Plaintiff could sustain his initial burden, the Court finds that—proceeding through the burden-shifting framework—Defendant is entitled to summary judgment on other grounds as well. Defendant says summary judgment is warranted because Plaintiff was terminated for legitimate reasons. Specifically, Plaintiff was terminated due to his poor performance, inability to consistently improve in his work product, and general

13

unprofessionalism. (Doc. 34 at 38–42). "Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment," *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008). This evidence overlaps considerably with the evaluation of Plaintiff's qualifications.

In summary, Plaintiff required extensive supervision from Swiggum and retraining from Swiggum and Skaggs, and he made repeated mistakes in his work product and record-keeping. (*See, e.g.,* Doc 26 at 155:2–156:15; Doc. 29 at 21:16–22:5, 25:2–17; Doc. 34-5, ¶¶ 9–23). His work was "always incomplete or require[d] focused oversight that is above and beyond what [QMAC] would expect at this point in his tenure here." (Doc. 26-2 at 163). After onboarding with the Program and acclimating in QMAC (Doc. 26 at 31:22–36:4, 46:6–48:15), Swiggum shared with Plaintiff his first quarterly evaluation, which noted that Plaintiff's performance needed to improve overall. (Doc. 26-1 at 177). Plaintiff was unorganized and did not start on a workload three months after the project had been assigned to him. (Doc. 26-1 at 175).

Plaintiff then had three months to internalize the feedback and improve his performance. But he did not. He trained with Arvelo and Skaggs for most of that time, and, while he did improve upon some relevant skills, Arvelo said that Plaintiff needed to do a better job of identifying and solving problems. (*Id.* at 183). Consistent with the first formal evaluation, Swiggum also noted that Plaintiff needed to improve upon his organization and attention to detail in this second quarter evaluation. (*Id.*).

Plaintiff then had another opportunity to improve. He was given another three-month period to internalize the feedback from the second quarter evaluation and improve his performance. Again, he did not. In April 2020, Swiggum informed Plaintiff in his third quarter evaluation that "he need[ed] to greatly improve . . . moving forward." (*Id.* at 190). Plaintiff was

14

"going through the motions and not taking work as serious[ly] as he has the potential to." (Doc. 26-1 at 190). Plaintiff was "lackadaisical" in addressing concerns raised by Swiggum and Koukourakis about time away from his workstation, staying focused on tasks, and recording time properly. (*Id.*). Plaintiff's performance "progress[ed] but regress[ed] in other areas." (Doc. 34-5 at 21). His knowledge about the DLA had improved, but Plaintiff did not implement basic feedback that he and Swiggum discussed numerous times. (*Id.*). In other words, Plaintiff was not meeting standards.

Still, Plaintiff was given yet another chance to improve. Again, he had three months to improve. This time, he did—but only to a degree. Plaintiff's general knowledge of the office remained consistent, and he continued to improve in developing verbal and written communication skills. (Doc. 26-1 at 196). Plaintiff "was able to mostly correct issues" and "piece together the knowledge gained," but there was "still room for improvement in all areas." (*Id.*). After over a year of working as a College Intern for forty hours per week (*see id.* at 171–98), Plaintiff did not always complete assignments and he made repeated mistakes, despite being trained on the relevant tasks multiple times. (*Id.* at 91). So, despite some improvement by Plaintiff, the Division Chief, DiPaolo, asked Koukourakis to reassign Plaintiff, because "the work he [was] assigned [was] always incomplete or require[d] focused oversight that [was] above and beyond what [DiPaolo, Souvannavong, and Swiggum] would expect at this point in [Plaintiff's] tenure [in QMAC]." (Doc. 26-2 at 163). The record clearly indicates that Plaintiff's performance always had room for improvement and that he largely ignored concerns raised by supervisors in formal and informal feedback. This alone is a legitimate, nondiscriminatory reason for terminating Plaintiff.

But, even beyond his performance issues, the record shows that Plaintiff acted unprofessionally, which is another legitimate, nondiscriminatory reason for termination. *See*

15

*Franks v. Vill. of Bolivar*, 583 F. App'x. 534, 538 (6th Cir. 2014); *see also Block v. Meharry Med. Coll.*, 723 F. App'x. 273, 283 (6th Cir. 2018). He would take prolonged breaks, leaving his desk unattended for sometimes hours at a time. (Doc. 34-5 at 2). Plaintiff "would, in the middle of training, take out his phone, text people, stand up, kind of shake his head a little bit, and he would kind of just look away. It's like he wasn't paying attention to what we were doing." (Doc. 29 at 11:11–15). Altogether, Defendant has sufficiently shown a legitimate and nondiscriminatory reason for terminating Plaintiff.

        iii.  Pretext

Because Defendant has shown a legitimate, nondiscriminatory reason for terminating Plaintiff, Plaintiff must therefore adduce enough evidence for a reasonable jury to conclude that Defendant's asserted reason was just pretext for illegal discrimination in order to survive summary judgment. *Burdine*, 450 U.S. at 255–56; *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). A plaintiff can do so by: (1) showing that the employer's reason has no basis in fact; (2) the reason did not actually motivate the employer's adverse employment action; or (3) by showing that the reason was insufficient to motivate the adverse employment action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008); *Jones*, 488 F.3d at 406.

As evidence of pretext, Plaintiff cites a single conversation between Souvannavong and Swiggum in which Swiggum simultaneously reports Plaintiff's relationship with Craig White, Plaintiff's performance issues, and his disability. Souvannavong responds, "I don't want that in my department." (Doc. 35 at 3 (citing Doc. 29 at 12–13)). Plaintiff claims that after Souvannavong learned of his disability, she scrutinized him intensely and had his workstation moved right outside her door so she could monitor him. (*Id.* (citing Doc. 29 at 13–14, 23–24)). He says this was part

of a "vendetta" she had against him "which was fueled by her knowledge of his disability." (Doc. 35 at 16).

Plaintiff's subjective belief about Souvannavong's motives is insufficient to establish pretext. *Hartsel v. Keys*, 87 F.3d 795, 801–02 (6th Cir. 1996) (holding that the employee's subjective belief as to why she was terminated fails to satisfy the summary judgment standard). While Souvannavong seemingly was a tough boss (*see* Doc. 26-1 at 92), she was hard on all her employees—not just Plaintiff. (*Id.* (Swiggum stating that "Souvannavong not only subjected [Plaintiff] to a toxic workplace atmosphere, but all of QMAC to some extent."). But, fortunately for many bosses, being strict, difficult, or micromanaging is not illegal. And the record does not show that Souvannavong treated Plaintiff differently than her other supervisees.

Further, Souvannavong did not terminate Plaintiff or even recommend his termination. In an attempt to link Souvannavong to the termination, Plaintiff briefly mentions the cat's paw theory in his response brief. (Doc. 35 at 14). Essentially, he says that though Souvannavong was not the ultimate decisionmaker regarding his termination, her alleged discriminatory intent and actions put focus and pressure on Plaintiff that eventually led to his termination. (*Id.* at 14–15). To make use of the cat's paw theory, Plaintiff must demonstrate that his supervisor had a discriminatory animus. *Boughton v. Garland*, 2022 U.S. Dist. LEXIS 56342, *37–38 (S.D. Ohio Mar. 29, 2022). But again, the only evidence presented by Plaintiff of discriminatory intent was Souvannavong's statement that she did not "want that in in her branch" when talking to Swiggum about Plaintiff. (Doc. 35 at 13). Because this statement was made in response to a wide-ranging conversation about Plaintiff's performance, familial relationship with the person who hired him (Craig White), and his disability, the statement's particular meaning is unclear. (Doc. 28 at 9; Doc. 29 at 12–13).

17

And, even if Souvannavong held a discriminatory animus against Plaintiff based on his disability, that is not enough to prove that her animus caused Plaintiff's termination. Again, she never recommended that he be terminated. (*See* Doc. 26-8 at 20). Neither did Swiggum, DiPaolo, or anyone else in QMAC. (*See id.*; Doc. 34-5, ¶ 5). Instead, they recommended reassignment to another office. (Doc. 26-8 at 20). Recommending reassignment is not necessarily an adverse employment action. *See Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (ruling that reassignments without changes in salary, benefits, title, or work hours do not constitute adverse employment actions unless reassignment results in conditions objectively intolerable to reasonable persons). The record does not indicate that Swiggum, Souvannavong, or DiPaolo were attempting to "constructively discharge," *id.*, Plaintiff or otherwise harm him through reassignment. In fact, the record shows that the intent behind the recommendation was, in part, to help Plaintiff. DiPaolo indicated in his request for Plaintiff's reassignment that they "believe[d] [Plaintiff] might find his calling elsewhere," and that "[a]nother role may be more interesting to him and will help him be successful at DLA." (Doc. 31-1 at 3). Plaintiff responded positively to the prospect. He perked up and "displayed a little more drive and effort" after learning he could be reassigned. (Doc. 29 at 35:11–18). Plaintiff himself believes that if he had been transferred to another office, "[he] could have been great." (Doc. 26 at 200:20–21). So Plaintiff has not shown that QMAC leadership's request for his reassignment was an adverse employment action, especially when Plaintiff himself invited the opportunity.

Ultimately, it was someone outside of QMAC, Colonel Payne, who made the decision to terminate Plaintiff. (Doc. 26-3 at 94). Colonel Payne was the Chief of Staff of DLA Land & Maritime and testified that, at the time of termination, he had no knowledge that Plaintiff had a disability. (*Id.* at 151 (Colonel Payne's deposition)). In making his decision to terminate Plaintiff,

Colonel Payne utilized a sixty-two-page report, which provided DiPaolo's request for Plaintiff's reassignment, a position description for College Interns, Plaintiff's quarterly evaluations, and Plaintiff's college transcripts and resume, among other items. (*See generally* Doc. 31-1). And, notably, Souvannavong did not meaningfully contribute to the records included in that sixty-two-page report. She authored only two emails included in the report, and, in those two emails, she simply asked for Koukourakis' input after Swiggum informed her of Plaintiff's timekeeping mistakes. (Doc. 31-1 at 43–44).

Colonel Payne saw from the report that Plaintiff was struggling. He saw Plaintiff's formal evaluations where his functional supervisor repeatedly remarked that Plaintiff's performance needed improvement and that Plaintiff lacked organizational skills and focus. (*Id.* at 22–28, 46–59). He saw that Plaintiff's functional supervisor identified him as "lackadaisical" and as appearing to go through the motions. (*Id.* at 58). He saw in the report that Plaintiff failed to maintain a 2.95 GPA as required by the Program. (*Id.* at 16–18, 29–39). And he saw that Human Resources, not Souvannavong or Swiggum or DiPaolo, recommended his termination. (*Id.* at 1, 19). Upon receipt of the reassignment request, HR was required to make a recommendation. But instead of recommending reassignment, HR advised Colonel Payne to terminate Plaintiff. (Doc. 31-3).

On this record, no reasonable jury could find that Defendant's reasons for terminating Plaintiff were pretextual. And, for this additional reason, summary judgment for Defendant is warranted.

## IV.   CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (Doc. 34) is **GRANTED**. This action is **DISMISSED**, and the Clerk is **DIRECTED** to enter final judgment.

19

IT IS SO ORDERED.

Date: March 9, 2023                              /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE